COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-430-CR

SHANNON DARELL DAVIS APPELLANT

A/K/A SHANNON D. DAVIS

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellant Shannon Darell Davis a/k/a Shannon D. Davis appeals his conviction for capital murder.  We affirm.

On September 20, 2005, appellant and four others set out to rob a drug dealer in his east Fort Worth apartment.  Three of the robbers, including appellant, carried loaded guns, and during the course of the robbery they shot two victims, one fatally, Hilda Herrera.  Following a two-day trial, a jury convicted appellant of capital murder, and the trial court sentenced him to life imprisonment.
(footnote: 2) 

In his first issue, appellant contends that the trial court erred in allowing a jury verdict that did not require the jury to agree unanimously on one of the State’s two theories of criminal liability.  The jury was charged on two theories of capital murder: that appellant was the one who actually shot and killed the victim and that appellant was guilty under the law of parties.
(footnote: 3)  Appellant argues that the evidence precludes him from being the shooter who killed Herrera. 

Appellate review of error in a jury charge involves a two-step process.
(footnote: 4) 
 First, we must determine whether error occurred.
(footnote: 5)  If so, we must then evaluate whether sufficient harm resulted from the error to require reversal.
(footnote: 6) 

The Texas Constitution requires a unanimous verdict in all felony cases.
(footnote: 7)  The unanimity requirement, however, is not violated by instructing the jury on alternative theories of committing the same offense.
(footnote: 8)  For example, jury unanimity on a defendant’s liability as a principal or as a party
(footnote: 9) to capital murder is not required as long as the jury unanimously agrees that the defendant committed the offense of capital murder.
(footnote: 10)  When the evidence is insufficient to support both primary and party theories of liability, however, the trial court errs by instructing the jury that it may convict the defendant either as a principal or as a party.
(footnote: 11) 

The evidence at trial showed as follows:

On September 20, 2005, Brianna Owens and David Bilbo conceived a plan to rob a drug dealer that Owens knew named Lamont Brown.  Bilbo recruited three of his roommates and friends—Christopher Wright, Michael Bowers, and appellant—to help with the robbery.
(footnote: 12)  The group planned that Owens and Bilbo would approach the apartment, Owens would introduce Bilbo as a potential buyer, and Bilbo would signal for Wright, Bowers, and appellant to enter and rob Brown. 

Owens and Bilbo drove to Brown’s apartment in one vehicle, and Wright, Bowers, and appellant followed them in another.  Bowers testified that there were four firearms in the second vehicle.  Bowers initially had a .380 caliber gun, but he discovered that it was unloaded, and appellant gave him a loaded .22 caliber gun as a replacement.  Wright carried a .25 caliber gun, and appellant carried a different .380 caliber gun.  Bowers left the unloaded .380 caliber gun in the car. 

According to the plan, Owens and Bilbo approached Brown’s garage apartment, entered, and spoke to Brown and Herrera, Brown’s wife.  At some point, Bilbo left the apartment, purportedly to retrieve a scale from his vehicle.  Bowers, Wright, and appellant then walked up to the apartment, Herrera let them in, and Owens ran out. 

Bowers was the only person inside the apartment at the time of the killing who testified at trial.  Once the assailants entered, Wright hit Herrera, and appellant held Brown at gunpoint while Bowers searched Brown’s pockets and the kitchen for money and drugs.  The robbers demanded to know where the safe was, and, when Herrera and Brown said they did not know, appellant shot Brown “four or five times” and Wright shot Herrera.
(footnote: 13)  Before leaving, Bowers also shot Herrera once, aiming for her head and intending to kill her.  After Wright and Bowers left the apartment, Bowers heard a final shot, and then appellant emerged as well.  

The medical and ballistics evidence corroborated Bowers’s testimony.  Herrera sustained four gunshot wounds, two of which were fatal.
(footnote: 14)  The two fatal shots hit Herrera in the head, both entering near her left ear.  A third, nonfatal shot entered near the left part of Herrera’s jaw.
(footnote: 15)  A fourth shot, also nonfatal, struck Herrera’s left shoulder, traveled through, and exited her body. 

An examination of the three bullets recovered from Herrera’s body during the autopsy revealed that the two fatal shots were from a .25 caliber and a .22 caliber firearm.  The third bullet, corresponding to the nonfatal jaw injury, was a .380 caliber.  The bullet creating the nonfatal shoulder injury was not found; the injury appeared consistent with a larger caliber bullet, but the caliber could not be determined with certainty. 

The police found several other fired bullets and cartridge casings in and around the apartment.  In the kitchen area, where Bowers testified that appellant held and shot Brown, there was a large pool of blood, four .380 caliber cartridge casings, and two .380 caliber fired bullets.  The two .380 caliber bullets from the kitchen had been fired from the same weapon as the .380 caliber bullet found in Herrera’s jaw.
(footnote: 16)  Further, two additional .380 caliber cartridge casings were found outside of the apartment; these two casings had been fired from a different weapon than the four .380 caliber casings found in the kitchen, suggesting the possibility of a fourth weapon.  Finally, unfired ammunition, including .380 caliber, was found in a box, a magazine, and a bank bag in the victims’ apartment. 

In reviewing this evidence for the purpose of evaluating appellant’s jury unanimity complaint, we conclude that it is insufficient to prove that appellant was guilty of capital murder as a principal.
(footnote: 17)  Herrera was killed by two shots to the head, one from a .22 caliber firearm and the other from a .25 caliber firearm.  Those were the weapons carried by two of the other robbers.  The only weapon associated with appellant was a .380 caliber, and that weapon caused at most two nonfatal wounds to Herrera (and, possibly, other injuries to Brown).  The prosecutor conceded as much in closing argument when, referring to the shot from the .380 caliber weapon that hit Herrera in the jaw, he said, “Was it the death shot?  No, probably not.  [The medical examiner] didn’t think so.  But does it show what his intent was, to kill?  Absolutely.”  Therefore, the trial court erred by submitting both principal and party theories of capital murder to the jury.
(footnote: 18)  

We must next determine whether appellant was harmed by this error.
(footnote: 19)  Appellant concedes that he failed to make a jury-unanimity objection in the trial court.  We, therefore, review the error for “egregious harm.”
(footnote: 20) 

In determining whether egregious harm occurred, “the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.”
(footnote: 21)  The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused.
(footnote: 22)  Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis.
(footnote: 23) 

The evidence supporting appellant’s responsibility for capital murder as a party was strong.  While Bowers and Owens were impeached with their criminal records, plea bargains, and prior inconsistent statements, their testimony 
was consistent with each other’s and was corroborated by ballistics evidence and appellant’s admissions.  Appellant told Christy Ray, an ex-girlfriend, that he robbed a “dope house” with Wright, Bowers, and Owens, and that Wright had shot and killed a girl during the robbery.  He further told Ray details that matched Owens’s and Bowers’s testimony, such as that the robbery was a “set up,” Owens was supposed to run out of the room, and the robbers got some marijuana from the victims.  Mikel McConnell, who lived with Ray, also overheard appellant and Bowers discussing an aggravated robbery that they committed with Wright, Bilbo, and Owens.  In addition, McConnell witnessed appellant hide from detectives who came to Ray’s apartment to investigate appellant, and McConnell saw appellant with a small gun that looked like a .25 caliber.
(footnote: 24) 

The State’s closing argument focused on appellant’s responsibility as a party to the capital murder.  Although appellant presented an alibi defense,
(footnote: 25) his attorney admitted in closing, “if you don’t believe his [alibi witness] . . . then he was there.”  The jury was free to accept or reject all or part of appellant’s defensive evidence, and by its verdict apparently disbelieved his alibi.
(footnote: 26)  Additionally, the jury refused to convict appellant merely of the lesser included offense of aggravated assault with a deadly weapon. 

After carefully considering the entire jury charge, the evidence, the argument of counsel, and other relevant information, we hold that the error in submitting the theory of primary liability in addition to party liability did not deny appellant a “fair and impartial trial” or “affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory.”
(footnote: 27)  Accordingly, we hold that appellant did not suffer egregious harm, and we overrule his first issue.

In his second issue, appellant contends that the trial court erred in failing to investigate his written complaints to the trial court that his appointed counsel was not providing adequate representation, resulting in a violation of appellant’s Sixth Amendment right to effective assistance of court-appointed counsel.
(footnote: 28) 

Appellant sent two letters complaining of his appointed attorney.  In the first letter, dated approximately four months before trial, appellant alleged among other things “a lack of communicating” and “inadequate and unreasonable counseling.”  In the second letter, dated approximately one month before trial, he attempted to reinstate his previous complaints against his attorney, which he indicated had been withdrawn, asserting for example, “I have neither met with my counsel to discuss my case or his defense tactics,” “I [am] seeking to dismiss counsel on grounds of failing to show interest in my case or familiarize himself with my case,” and “There hasn’t been [any] communication between myself and [trial counsel].”  Appellant contends that the trial court took no action in response to either letter. 

Appellant concedes that under Texas law he cannot complain on appeal of the trial court’s failure to investigate his requests for a substitute court-appointed attorney, unless he requested a hearing before the trial court and obtained a ruling on his request for a new attorney.
(footnote: 29)  Citing federal cases, appellant argues that Texas law in this regard is inconsistent with the Sixth Amendment of the United States Constitution.
(footnote: 30) 

As an intermediate appellate court, we are bound by controlling decisions of the Texas Court of Criminal Appeals.
(footnote: 31)  That court has determined that once a trial court appoints an attorney to represent an indigent defendant, the defendant has been afforded all the constitutional protections regarding counsel provided for under the Sixth and Fourteenth Amendments, and the Constitution imposes no duty on a trial court to sua sponte hold a hearing and assess trial counsel’s effectiveness every time a criminal defendant expresses dissatisfaction.
(footnote: 32) 
 Even assuming appellant brought his complaints to the trial court’s attention, he neither requested a hearing nor otherwise attempted to make a record to support his contentions.
(footnote: 33)  Therefore, no error is presented for our review.
(footnote: 34)  We overrule appellant’s second issue.  

Having overruled appellant’s issues, we affirm the trial court’s judgment.

PER CURIAM

PANEL A:  CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

DO NOT PUBLISH 

Tex. R. App. P.
 47.2(b)

DELIVERED:  February 28, 2008 

FOOTNOTES
1:
See
 
Tex. R. App. P. 47.4.

2:
The State did not seek the death penalty. 

3:
The jury charge, in pertinent part, stated, 

Now, if you find from the evidence beyond a reasonable doubt that on or about the 20
th
 day of September, 2005, in Tarrant County, Texas that the Defendant, Shannon Darell Davis, did intentionally cause the death of an individual, Hilda Herrera, by shooting her with a firearm, and the said Defendant was then and there in the course of committing or attempting to commit the offense of robbery,
 or that the Defendant, Shannon Darell Davis, acting with the intent to promote or assist in the commission of the offense of capital murder, solicited, encouraged, directed, aided or attempted to aid Michael Bowers or Christopher Wright to commit the offense of capital murder, then you will find the Defendant guilty of capital murder as charged in the indictment. 

The trial court also charged the jury on the lesser included offense of aggravated assault with a deadly weapon (again both as primary actor for that offense and as a party). 

4:
Abdnor v. State
, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).

5:
Id
.

6:
Id.
 at 731–32.

7:
Tex. Const
. art. V, § 13; 
Stuhler v. State
, 218 S.W.3d 706, 716 (Tex. Crim. App. 2007).

8:
E.g.
,
 Martinez v. State
, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004) (holding prosecutor’s argument that jury need only agree that appellant was guilty of capital murder, but need not agree whether he committed the murder in the course of committing or attempting to commit robbery or aggravated sexual assault, was proper); 
Francis v. State
, 36 S.W.3d 121, 124 (Tex. Crim. App. 2000).
  

9:
A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.  
Tex. Penal Code Ann.
 § 7.01(a) (Vernon 2003).  A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  
Id.
 § 7.02(a)(2) (Vernon 2003).  Each party to an offense may be charged with commission of the offense.  
Id.
 § 7.01(b).

10:
Toluao v. State
, No. 02-04-00040-CR, 2005 WL 1994179, at *3 (Tex. App.—Fort Worth Aug. 18, 2005, pet. ref’d) (mem. op., not designated for publication)
.

11:
Id.
; 
see also Kitchens v. State
, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) 
(“It is appropriate where the alternative theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted.”), 
cert. denied
, 504 U.S. 958 (1992). 

12:
Several of these individuals had nicknames that appear throughout the record: appellant was known as “Redrum” (“murder” spelled backwards) and “Iceberg”; Bilbo was known as “YC”; and Brown was known as “Chongo.” 

13:
Brown survived but did not testify at trial.  

14:
The medical examiner could not determine the order of the injuries.  

15:
The medical examiner discussed the fatality of the third gunshot wound to the jaw as follows: “Well, it’s potentially of concern as far as the fatality is concerned, but it by itself is not.  Without treatment or medical care, it may have a lot of complications, but it was not an acutely fatal gunshot wound.”  

16:
It was not possible, however, to compare the casings to the bullets to determine whether they had been shot from the same weapon.

17:
See Clayton v. State
, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (setting out legal sufficiency standard of review).

18:
See Toluao
, 2005 WL 1994179, at *3.

19:
See Abdnor
, 871 S.W.2d at 731–32.

20:
See Stuhler
, 218 S.W.3d at 713–14; 
Abdnor
, 871 S.W.2d at 732.

21:
Almanza v. State
, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh’g); 
see also Hutch v. State
, 922 S.W.2d 166, 172–74 (Tex. Crim. App. 1996).

22:
Almanza
, 686 S.W.2d at 174.

23:
Ellison v. State
, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); 
Hutch
, 922 S.W.2d at 171.

24:
Appellant also asked McConnell to throw away a pair of his shoes, even though it did not appear to McConnell there was anything wrong with the shoes. 

25:
Appellant’s defensive theory was that he was not present.  His mother testified that appellant was at her home in Watauga at the time of the killing.

26:
See Saxton v. State
, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

27:
See Hutch
, 922 S.W.2d at 171–72 (citations and internal quotation marks omitted).

28:
Appellant does not contend that his attorney’s performance at trial was deficient. 

29:
Carroll v. State
, 176 S.W.3d 249, 256 (Tex. App.—Houston [1st Dist.] 2004, pet. ref’d); 
see also Corona v. State
, Nos. 04-02-00861-CR, 04-02-00862-CR, 2004 WL 56922, at *1–2 (Tex. App.—San Antonio Jan. 14, 2004, pet. ref’d) (mem. op., not designated for publication) (holding trial court had no obligation to initiate an inquiry where appellant’s motion to dismiss merely alleged his attorney was not adequately preparing for trial and was no longer trusted).

30:
See, e.g.
, 
United States v. Young
, 482 F.2d 993, 995 (5th Cir. 1973).

31:
Wiley v. State
, 112 S.W.3d 173, 175 (Tex. App.—Fort Worth 2003, pet. ref’d).

32:
Malcom v. State
, 628 S.W.2d 790, 792 (Tex. Crim. App. [Panel Op.] 1982).

33:
See Hill v. State
, 686 S.W.2d 184, 187 (Tex. Crim. App. 1985); 
Sexton v. State
, Nos. 02-06-00040-CR, 02-06-00041-CR, 2007 WL 439107, at *2 (Tex. App.—Fort Worth Feb. 8, 2007, pet. ref’d) (mem. op., not designated for publication).

34:
Hill
, 686 S.W.2d at 187; 
Sexton
, 2007 WL 439107, at *2.